

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-12-2005

# LaFata v. Raytheon Company

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-1560

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"LaFata v. Raytheon Company" (2005). *2005 Decisions.* Paper 704.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/704

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

NO. 04-1560

————

MICHAEL LAFATA, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED;
Appellant

v.

RAYTHEON COMPANY; RAYTHEON ENGINEERS &
CONSTRUCTORS INTERNATIONAL, INC.;
RAYTHEON ENGINEERS & CONSTRUCTORS;
WASHINGTON GROUP INTERNATIONAL, INC.;
RAYTHEON ENGINEERS & CONSTRUCTORS, INC. SEVERANCE
PAY PLAN; UNITED ENGINEERS CONSTRUCTORS, INC.;
RAYTHEON COMPANY 1995 STOCK OPTION PLAN;
JOHN R. GALVIN, C/O RAYTHEON COMPANY;
BARBARA M. BARRETT, C/O RAYTHEON COMPANY;
FERDINAND COLLOREDO-MANSFELD, C/O RAYTHEON
COMPANY; ALFRED M. ZEIEN, C/O RAYTHEON COMPANY;
DANIEL P. BURNHAM, C/O RAYTHEON COMPANY;
SHAY D. ASSAD, C/O RAYTHEON COMPANY

————

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 01-cv-01220)
District Judge:  Hon. Anita B. Brody

————

Argued April 22, 2005

BEFORE:  ROTH, FUENTES and STAPLETON,   Circuit Judges

(Filed: August 12, 2005 )

Gavin P. Lentz
Bochetto & Lentz
1524 Locust Street
Philadelphia, PA  19102
  and
Robert S. Kitchenoff
David H. Weinstein (Argued)
Kellie A. Allen
Weinstein, Kitchenoff, Scarlato, Karon & Goldman
1845 Walnut Street - Suite 1100
Philadelphia, PA  19103
  Attorneys for Appellant

Richard J. Antonelli (Argued)
Spilman, Thomas & Battle
301 Grant Street
One Oxford Centre - Suite 3440
Pittsburgh, PA  15219
  Attorney for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Michael LaFata and the class he represents assert ERISA claims under § 502(a)(1)(B), 29 U.S.C.S. § 1132, and § 510, 29 U.S.C.S. § 1140.  The District Court entered summary judgment against them, and they now appeal.  We will affirm.

I.  The Transactions

Prior to the events giving rise to this controversy, Raytheon Engineers & Constructors ("RE&C"), which employed Michael LaFata ("LaFata") and members of his class, was a wholly-owned subsidiary of Raytheon Engineers & Constructors International, Inc. ("RECI"), which was, in turn, a wholly-owned subsidiary of Raytheon Company ("Raytheon").

As RE&C employees, LaFata and other class members were the beneficiaries of RE&C's Termination of Employment Policy ("the Plan") that provided for severance benefits.[1]  The Plan delineated two categories of termination – voluntary and involuntary. The Plan classified four types of involuntary termination: layoff, release, reorganization, and discharge.  Section 10 of the Plan provided for severance pay to full-time employees whose terminations were classified as layoff, release, or reorganization (but not for "discharge").  Each of these terms is defined by the Plan:

> A lay-off is "an involuntary termination of employment with the Company when, because of economic or organizational reasons, a reduction of force is required."

[1]Some of the constituent benefit programs participated in by LaFata, including the Termination of Employment Policy, were incorporated into the Welfare Benefit Plan which operated as an umbrella plan for other RE&C employee plans.  The Welfare Benefit Plan confers upon the "Plan Administrator . . . absolute discretion to construe and interpret any and all provisions of the Plan and the Constituent Benefit Programs."  The Termination of Employment Policy does not make reference to the Welfare Benefit Plan, however, and for that reason and others, LaFata insists that we should not defer to the Plan Administrator's interpretation of the severance pay provisions.  Raytheon and RECI, on the other hand, argue that the Plan Administrator's denial of severance pay can be overturned only if arbitrary and capricious.  We need not resolve this conflict because we find the relevant provisions of the Plan unambiguous in the context of the situation presented here.

> A release is "an involuntary termination of employment with the Company when it is determined that an employee cannot, through no fault of their own, perform the work assigned."
>
> A re-organization is an "involuntary termination of employment due to a change in Company structure."

App. at 651a-652a.

In April of 2000, Raytheon, RECI, and Morrison Knudsen Corporation ("MK") entered a Stock Purchase Agreement ("the SPA"), calling for MK to purchase from RECI all of its stock in RE&C, along with other specified RECI corporate assets including the stock of other RECI subsidiaries. As soon as MK acquired all of the stock of RE&C on July 7, 2000, its Board of Directors adopted a resolution merging RE&C into itself. Certificates effectuating the merger were filed in Ohio on July 7, 2000 and Delaware on July 10, 2000. This merger was not spoken of in the SPA. MK did commit itself in the SPA to employ employees of RE&C after the closing date if they were no longer employed by RE&C.

LaFata and the class he represents here seek to recover severance benefits from Raytheon and RECI, and, accordingly, we have occasion to address only the liability of those defendants. MK and the remaining defendants have entered a settlement agreement with LaFata and his class and are not parties to this appeal.

## II. The Section 502(a)(1)(B) Claim

ERISA Section 502 (a)(1)(B) authorizes any person to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the

4

terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

LaFata here seeks to recover termination benefits under Section 10 of the Plan. He alleges that he and a class of RE&C employees suffered a termination of employment on July 7, 2000, when RE&C's stock was sold to MK under the SPA and that this alleged termination entitled them to severance pay.[2]

The initial issue for resolution is whether the sale of RE&C stock to MK constituted "an involuntary termination of employment due to a change in company structure." Clearly it did not. There was no "change in [RE&C's] Company structure" occasioned by that sale.

The District Court concluded that LaFata had tendered sufficient evidence to permit a trier of fact to conclude that he experienced a "termination of employment" on July 7, 2000. If such a termination occurred on that date, however, it was the result of the merger of RE&C into MK, not the sale of the RE&C stock.[3] This is significant for two reasons. Recognizing that RECI and Raytheon played no role in the decision to merge, LaFata has fashioned two theories in an effort to make them legally responsible for the conduct of others. Both theories fail to take into account that the merger was responsible

_____

[2]"Severance pay" as used herein includes accrued vacation pay.

[3]Because we conclude that any "termination of employment due to a change in Company structure" occurred after the sale of RE&C stock, we have no occasion to address whether the District Court erred in holding that the record would support a finding that there was a "termination of employment" during the course of the events referenced in LaFata's complaint.

for any change in corporate structure that may have occurred.

LaFata's first theory is predicated on Section 9.3(d) of the SPA. That section provides:

> The Sellers shall be responsible for amounts payable . . . for severance, change of control, or similar amounts payable to any Assumed Employees and arising solely from the consummation of the transactions contemplated by this Agreement.

App. at 69; 490a. LaFata insists that he and the members of his class are third party beneficiaries of this provision. We are unpersuaded.

We find no ambiguity in § 9.3(d). It applies only to "amounts payable . . . for severance . . . and *arising solely from the consummation of the transactions contemplated by*" *the SPA*. As we have noted, so far as here relevant, the only transactions contemplated by the SPA were sales of RECI's stock in its subsidiaries. It simply does not speak of a merger of RE&C into MK.

Moreover, LaFata's argument overlooks the provision of the SPA which speaks directly to third party beneficiaries. Section 16.9 provides:

> Except as otherwise expressly provided herein, nothing herein expressed or implied is intended or shall be construed to confer upon or to give any person, firm, or corporation, except Sellers and the Buyer and as provided in Article 13 with respect to the Buyer Indemnified Parties and the Seller Indemnified Parties, any rights or remedies under or by reason of this Agreement.

App. at 17a (footnotes omitted). Section 13.1 defines the Buyer Indemnified Parties as

6

the "Buyer, its Subsidiaries and affiliates (and each of their respective directors, officers, shareholders, agents and employees." Section 13.2 defines the Seller Indemnified Parties in complementary fashion.

We find this provision unambiguous as well. The parties clearly intended no third party beneficiaries "except as otherwise expressly provided" in the SPA.[4] And it is equally clear that the provision under which LaFata claims to be entitled to severance pay, Section 9.3(d), does not expressly confer third party beneficiary status on persons in LaFata's position.

LaFata's second theory imposing liability on Raytheon and RECI for the conduct of others is described as the "Single Employer or Integrated Enterprise Standard of Liability" which is said to be applicable "for purposes of federal employment statutes":

> A "single employer" relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a "single employer." The question in the "single employer" situation, then, is whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise*.

*N.L.R.B. v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1112, 1122 (3d

---

[4]Under New York law, the applicable state law here, a third party is entitled to only those rights which the original parties to the contract intended the third party to have. 22 N.Y. Jur. Contracts § 302; *Leavitt-Berner Tanning Corp. v. American Home Assurance Co.*, 516 N.Y.S. 2d 992, 995 (N.Y. App. Div. 1987); *see also 981 Third Ave. Corp. v. Beltramini*, 485 N.Y.S. 2d 535, 538 (N.Y. App. Div. 1985) ("[I]t is often stated by the courts that the contract must have been intended for the benefit of the third person in order to entitle him to enforce same.").

Cir. 1982) (emphasis in original).

We need not consider whether this "single employer" doctrine is applicable in the context of a federal employment statute like ERISA where employer participation is voluntary. Even if it be deemed applicable to liability under ERISA, this would not help LaFata. We may assume that he has tendered sufficient evidence to permit a trier of fact to conclude that Raytheon, RECI and RE&C were a single employer prior to the sale of RECI's stock in RE&C. Nevertheless, the record will not support a conclusion that RE&C was an integrated part of Raytheon or RECI after it was wholly owned by MK. As the subsequent events of July 7, 2000, demonstrate, RE&C was owned and controlled by MK as soon as the sale of its stock closed. This fact, together with the fact that the sale did not give rise to severance pay rights, means that Raytheon and RECI are not responsible to LaFata and his class for severance pay.

## III. The Section 510 Claim

Section 510 of ERISA provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

In support of his contention that Raytheon and RECI violated § 510 by "discharging" and "discriminating" against him, LaFata points to evidence which he believes would support a finding that the sale of the business of RE&C was structured as

8

a sale of stock rather than a sale of assets because Raytheon and RECI believed that a sale of stock would not trigger severance benefits under the Plan. We will assume for present purposes that the current record would permit such a finding. We agree with the District Court, however, that no violation of § 510 occurred.

These are the elements of a meritorious § 510 claim: "(1) proscribed employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Gavalik v. Continental Can Co.*, 812 F.2d 834, 852 (3d Cir. 1987). To satisfy the first element, the defendant must have engaged in an act prohibited by § 510; "[t]here must be some act in furtherance of an employer's desire to interfere with an employee's rights to pension benefits." *Id*. The only prohibited acts relevant to this appeal are "discharge" and "discrimination."

We agree with the District Court that Raytheon and RECI cannot be said to have "discharged" LaFata. As the District Court observed, "[a]ll Raytheon and RECI did was to sell stock." App. at 19a. Under any view of these facts, LaFata was not discharged by that sale and Raytheon and RECI cannot be said to have "discharge[d]" LaFata subsequent to the stock sale because they no longer owned RE&C at that point. If LaFata was "discharge[d]," it could only have been by RE&C or its new owner.

LaFata does not satisfactorily explain how Raytheon and RECI "discriminated" against him and the members of his class and, like the District Court, we perceive no discrimination. The sale of RECI's stock in RE&C did not discriminate between RE&C

9

employees or between classes of RE&C employees; rather, it treated all employees equally. *Phillips v. Amoco Oil Co.*, 799 F.2d 1464 (11th Cir. 1986). ("[A]s the entire business was sold in this case, there could not have been discrimination among employees" for purposes of § 510). Where all employees are treated equally, "the sale of an ongoing business is not prohibited by section 510." *Blaw Knox Retirement Income Plan v. White Consol. Indus., Inc.*, 998 F.2d 1185 (3d Cir. 1993).[5]

## IV. Conclusion

The judgment of the District Court will be affirmed.

---

[5]In *Eichorn v. AT & T Corp.*, 248 F.3d 131 (3d Cir. 2001), the sole issue presented to the Court in connection with the § 510 claim was whether the plaintiffs had tendered sufficient evidence to permit a finding that the defendants "had the specific intent to interfere with the . . . employees' pension benefit rights." *Id*. at 149. The defendants did not argue that the evidence would not support a finding that they discriminated. This may well have been because the no-hire agreement which effectively cancelled the plaintiffs' pension bridging rights discriminated against former Paradyne employees whose compensation exceeded $50,000.

10

Fuentes, *Circuit Judge*, concurring.

I write separately in this case because, while I concur in the judgment, I believe that Plaintiff La Fata and the other class members experienced a termination of employment under the RE&C Termination of Employment Plan as a result of the merger of RE&C into Morrison Knudsen. Although the majority addresses only whether the sale of RE&C stock, standing alone, terminated La Fata, I believe it is also important to decide whether La Fata was terminated as a result of the merger. La Fata does not assume, but rather attempts to show, that Raytheon's actions in the course of the RE&C stock sale anticipated the subsequent merger, and he further argues that its intentions with respect to the merger created liability for it. While I agree with the majority that he fails ultimately to establish Raytheon's liability, I agree with La Fata, and the District Court, that the record supports a finding that class members were terminated under the terms of their severance policy.

I agree with the majority that a sale of stock will not normally disrupt existing contractual relationships. See NLRB v. Rockwood Energy & Mineral Corp., 942 F.2d 169, 173-74 (3d Cir. 1991). But an existing relationship may be severed – i.e., an employee terminated – when the terms of an employment contract are in fact substantially altered.[6]

_____

[6] Termination in the context of at-will employment, as in this case, does not concern termination of an employment contract per se. Rather, termination here implies a "new" contract with substantially different terms. At least two other circuits have indicated that termination may take place upon a change in ownership. See Harris v. Pullman

11

Our Court has held that "severance pay benefits may be intended to compensate an employee for the possibility of lower salary and benefits even when his or her employment continues without interruption with a new employer."  Kotrosits v. GATX Corp. Non-contributory Pension Plan for Salaried Employees, 970 F.2d 1165, 1171 (3d Cir. 1992); see also Ulmer v. Harsco Corp., 884 F.2d 98, 101, 104 (3d Cir. 1989) (holding severance was due where "terms of [plaintiffs'] employment were significantly worsened" under new owner).  Thus, the term "termination" in a severance policy should be construed to cover not only those employees who experience a total loss of employment, but also employees who experience a substantial reduction in direct or indirect compensation.[7]  An employee who experiences a radical change in the terms of employment is effectively terminated from the previous position; the fact that the employee may be offered a new position, whether by the legal successor to a previous

_____

Standard, Inc., 809 F.2d 1495, 1498 (11th Cir. 1987) (holding that employees were entitled to severance payments under benefits plan which awarded them "for all involuntary terminations"); Blau v. Del Monte Corp., 748 F.2d 1348, 1354-55 (9th Cir. 1985) (holding that plan which provides for severance when jobs are "eliminated" and "alternative employment opportunities are unavailable within the Corporation" "does not condition receipt of severance benefits upon elimination of positions from the face of the earth," "subsequent unemployment," or "failure of a successor corporation to offer employees jobs after their employment with Del Monte ceases") (emphasis omitted), abrogated on other grounds as recognized in Dytrt v. Mountain States Tel. & Tel. Co., 921 F.2d 889, 894 n. 4 (9th Cir. 1990).

[7]If termination were construed otherwise, employers could always avoid severance by simply eliminating benefits and offering an employee minimum wage, with the expectation that the employee would "voluntarily" leave the company.  Such a nonsensical reading of the severance policy would defeat its purpose entirely.

12

employer or an altogether new company, does not affect the employee's interest in compensation under a severance plan. By contrast, where compensation remains essentially the same under a new owner, employees are not terminated and courts have not awarded severance pay. See Schroeder v. Phillips Petroleum Co., 17 F.3d 1147, 1148 (8th Cir. 1994) ("[T]he sale or discontinuance of a business does not entitle employees to benefits under a severance plan if a new or successor employer continues their employment without interruption under substantially identical terms and conditions.").

Whether employees are terminated upon the sale of a business, for severance purposes, does not hinge on whether the sale is structured as a sale of stock or a sale of assets. RE&C's severance policy, like other severance policies, was intended to protect RE&C employees "from a sudden change in the employment relationship." John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 549 (1964) (discussing National Labor Relations Act). When a new employer effects such a sudden change, employees experience "termination" as the term is commonly used in severance policies. That is exactly what occurred here.

A factfinder could infer, for reasons outlined by the District Court, that a termination occurred here. First, a Raytheon employee stock option report indicated that those options were terminated for "former RE&C employees" on July 7, 2000, the day of the stock sale. In all but one case, unvested stock options expired on the closing date.

13

Second, under the terms of the Morrison Knudsen 401(k) plan, years of service for RE&C employees were calculated using July 8, 2000 as the first day of employment. Third, in internal communications, Raytheon and Morrison Knudsen referred to class members as "terminated" and as "former RE&C employees," which may suggest that these employees were also "terminated" as the term was used in the severance policy.

Most important, former RE&C employees experienced a number of benefit changes. First, the defined benefit pension plan provided by RE&C was terminated. Second, former RE&C employees could no longer participate in the Raytheon Scholars program. Third, unlike the Raytheon plan in which former RE&C employees had participated, the 401(k) plan offered by Morrison Knudsen did not offer employer stock as an investment option. Fourth, the Morrison Knudsen 401(k) plan, unlike the Raytheon plan, did not allow for after-tax contributions. Fifth, unlike the Raytheon 401(k) plan, under which employer contributions vested immediately, employer-matching contributions in the Morrison Knudsen plan vested over a five-year period. Based on all of this evidence, the District Court found, and I agree, that plaintiffs have created a genuine factual dispute as to whether they had been terminated.

Notably, not every termination will trigger severance pay under the Plan. Under Part X of the Severance Policy, La Fata was entitled to benefits only if his termination resulted from a "reorganization."[8] Again, I agree with the District Court that La Fata's

[8]La Fata does not contend he was terminated due to a "layoff" or "release."

14

terms of employment were altered "due to a change in Company structure." Section IV(B)(3) of the Severance Policy (defining "reorganization"). The various changes that took place were all directly related to the merger of RE&C into Morrison Knudsen, which Morrison Knudsen and RE&C themselves referred to as a "reorganization." RE&C's eight divisions shrank to five under Washington Group and all but one division head was replaced. The merger was clearly a "reorganization" that qualified La Fata for severance if it resulted in termination.

In my view, if plaintiffs are able to show that they experienced a substantial change in the terms of their employment as a result of a reorganization at RE&C, they will have demonstrated eligibility for severance. However, because the facts alleged by La Fata do not suggest sufficient evidence to establish Raytheon's liability for severance, I concur in the judgment of the Court.